IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALI EKHLASSI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-1257 |
| | § | |
| NATIONAL LLOYDS INSURANCE CO. | § | |
| and AUTO CLUB INDEMNITY CO., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION GRANTING AUTO CLUB'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case arises from a dispute over flood-insurance payments for damage during the Memorial Day Storm in May 2015. Ali Ekhlassi held two insurance policies: a Texas Homeowners Deluxe Policy issued by the Auto Club Indemnity Company and a flood-insurance policy with National Lloyds Insurance Company, underwritten by the Federal Emergency Management Agency. (Docket Entry Nos. 16-2, 16-3). Auto Club moves for partial summary judgment on Ekhlassi's claims, on the ground that the policy explicitly excluded flood damage from coverage. (Docket Entry No. 16). Ekhlassi did not respond to Auto Club's motion.

Based on the motion, the record evidence, and the applicable law, Auto Club's motion for partial summary judgment is granted and Eklassi's claims against Auto Club are dismissed, with prejudice. The reasons are stated below.

**I.    Background**

The relevant facts are undisputed. Between May 23 to 25, 2015, a severe storm caused heavy flooding in Houston. Ekhlassi suffered significant damage to his home when five to six feet

1

of floodwater filled his unfinished basement garage for two days. Ekhlassi alleges a loss amount of $258,437.29 for the flood-related damage. (Docket Entry No. 16-6 at 4). Ekhlassi had coverage under both the Homeowners policy from Auto Club and the flood-insurance policy from National Lloyds before and during the storm. The Auto Club policy is a "named peril policy," covering only specifically listed categories of losses. (Docket Entry No. 16-10 at 2).

Ekhlassi filed a claim with National Lloyds for the policy limit of $250,000 and an additional claim with Auto Club under his Homeowners Policy. (Docket Entry Nos. 16-5, 16-10 at 2). Auto Club's adjuster, Mike Hendricks, and engineer, Darin Lasater, inspected Ekhlassi's home and determined that all of the alleged damage was flood-related. (Docket Entry No. 16-4). Based on that determination, Auto Club denied Ekhlassi's claim because flood damage was not a named peril under his policy. (Docket Entry No. 16-4 at 2). Indeed, the policy specifically excluded water damage from coverage. (Docket Entry No. 16-12).

Ekhlassi submitted proof of damage and losses to an elevator cab, to the flooring in the basement and kitchen, and to kitchen cabinets. (Docket Entry Nos. 16-6–16-9). It is undisputed that the floodwater caused the damage to the elevator and basement floor. It is also undisputed that the kitchen cabinets were not damaged during the flood. They were removed and replaced to address potential damage to any wood flooring extending underneath the cabinets. But it is also undisputed that the wood floor did not extend underneath the cabinets. Instead, the wood floor stopped in front of the cabinets.

Ekhlassi sued National Lloyds and Auto Club, alleging breach of contract, violation of Chapters 541 and 542 of the Texas Insurance Code, and violations of the Deceptive Trade Practices Act. TEX. INS. CODE § 541.060, 542.055-60; TEX. BUS. COM. CODE § 17.46. Because Ekhlassi did

not respond to Auto Club's motion, the summary judgment record consists only of Auto Club's submissions. That evidence includes: Auto Club's Texas Homeowners Deluxe Policy; National Lloyds Insurance Company's floor policy; an affidavit from Auto Club's engineer, Darin Lasater; Ekhlassi's proof of loss submitted to National Lloyds; Ekhlassi's Rule 26(a) initial disclosures, including estimates for repairing the damaged elevator and floors, and for removing and replacing the kitchen cabinets; photographs of the damage; a settlement letter from Auto Club to Ekhlassi; settlement documents and a check from National Lloyds to Ekhlassi; affidavits from Randall Taylor, Auto Club's expert adjuster, and Claudia Lezell, Auto Club's flooring expert; and reports from Cory Walker, National Lloyds' engineer, and Peter de la Mora, Ekhlassi's engineer.

The summary judgment record is analyzed under the applicable legal standards.

## II. The Legal Standard

### A. The Summary Judgment Standard

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

3

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing an absence of evidence to support the nonmoving party's case. *Fret v. Melton Truck Lines, Inc.*, No. 17-50031, 2017 U.S. App. LEXIS 16912, at *5–6 (5th Cir. Sept. 1, 2017) (quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (citing *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 Fed. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 Fed. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 Fed. App'x 313, 317 (5th Cir. 2016) (quoting Boudreaux, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all

reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

### B. Insurance Contracts and Claims

"Texas courts construe insurance contracts under the same rules applicable to contracts generally." *Nautilus Ins. Co. v. Country Oaks Apts. Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Ins.*, 907 S.W.2d 517, 520 (Tex. 1995)). The court's "primary goal, therefore, is to give effect to the written expression of the parties' intent." *Id.* (quoting *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998)). "If a written contract is amenable to a definite legal meaning, then it is unambiguous and will be enforced as written." *Id.* (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). "An insurance policy is only ambiguous if its plain language is amenable to more than one reasonable interpretation." *Id.*

Section 542.055 of the Texas Insurance Code requires an insurer to acknowledge receipt of a claim, begin investigating it, and request any additional items or statements from the claimant no later than the 15th day of receiving notice of the claim. TEX. INS. CODE. § 542.055(a). Section 542.058 prohibits an insurer from delaying payment of a claim beyond 60 days. The penalty is damages under § 542.060. TEX. INS. CODE § 542.058. Section 541.060 of the Texas Insurance Code prohibits unfair or deceptive acts or practices in the insurance business, including failing to make a good-faith attempt at a "prompt, fair, and equitable settlement," failing to timely affirm or deny a policyholder's claim, or "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." TEX. INS. CODE § 541.060(a).

The Deceptive Trade Practices Action prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade of commerce," defined, in part, as: (5) "representing that goods

5

or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not; . . . (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; . . . [and] (20) representing that a guaranty or warranty confers or involves rights or remedies which it does not have or involve." TEX. BUS. & COM. CODE § 17.46(a); (b)(5), (7), (12), (20).

## III. Analysis

The undisputed record evidence shows that Ekhlassi's Auto Club Homeowners Policy did not cover flood damage. The policy states that Auto Club insures "against physical loss to the property described in Coverage A (Dwelling) and Coverage B (Personal Property) caused by a peril listed below, unless the loss is excluded in Section I exclusions." (Docket Entry No. 16-2 at 17). The list of named perils includes fire and lightning; sudden and accidental damage from smoke, windstorm, hurricane, and hail; explosion; aircraft and vehicles; vandalism and malicious mischief; riot and civil commotion; theft; sudden and accidental tearing apart, cracking, burning or bulging caused by steam or hot water heating in a building; vehicles; falling trees or limbs; objects falling from ice or snow; collapse; glass breakage; sudden and accidental discharge or overflow of water or steam from a plumbing system; and freezing. (Docket Entry No. 16-2 at 17–19). The policy specifies that coverage for windstorms or hurricanes does not include "loss caused by rain . . . whether or not driven by wind, unless the direct force of wind or hail makes an opening in the roof or wall and the rain . . . enters through this opening and causes the damage." (Docket Entry No. 16-

6

2 at 18). Under the "Exclusions" section, the policy states that it does not cover "loss caused directly or indirectly by . . . Water Damage." (Docket Entry No. 16-2 at 19–20). The policy defines "Water Damage" as "flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind." (Docket Entry No. 16-2 at 20). The policy's plain language excludes coverage for any flood damage. Auto Club had no contractual obligation to cover Ekhlassi's flood-damage claim.

The undisputed record evidence shows that the disputed loss occurred during and as a result of the flood. There is no dispute that the flood caused the floor damage. Darin Lasater, Auto Club's engineer, concluded that "the flood water in the basement resulted in widespread cupping of the hardwood and plastic laminate flooring on the first floor or the residence sue to elevated water vapor on the underside of the floor." (Docket Entry No. 16-4 at 3). Auto Club's adjuster, Randall Taylor, also concluded that "[t]he cupping of the wood flooring [he] observed on July 21, 2017 is clearly the result of increased moisture content from the basement below the wood flooring, as a result of flood waters from the May 24–26, 2015 Memorial Day storm." (Docket Entry No. 16-13 at 3). Claudia Lezell, Auto Club's flooring expert, made the same determination: "In conclusion, it is my professional opinion, with a reasonable degree of certainty, that the issues with the cupped floor covering on the first floor is from an imbalance of moisture from below and was not the result of the ingress of flood waters, covering the wood floor covering up through the basement level." (Docket Entry No. 16-14 at 5). Cory Walker, National Lloyd's engineer, concluded that "[t]he hardwood flooring on the first floor level has experienced minor warping (cupping) from exposure to humidity (airborne water vapor) inside the basement. Some of the humidity that caused the hardwood floor to cup was emitted from surface storm water that rose into the basement on or around 5/25/15. It

7

is also possible that humidity inside the basement has reached levels high enough to affect the hardwood flooring at other times when no surface water or flooding was present." (Docket Entry No. 16-17 at 4). Finally, Peter de la Mora, Ekhlassi's engineer, stated: "We have formed the opinion; the moisture content of the hardwood floors was affected by the increase interior relative humidity in the interior climate of the house caused by the flood waters in the house for about two days . . . In our opinion, this light cupping of the hardwood floors was caused by increasing ambient humidity in the house during the floor period." (Docket Entry No. 16-18 at 6).

There is similarly no dispute that the flood caused the elevator damage. Lasater concluded that "the flood water in the basement resulted in . . . a damaged elevator cab." (Docket Entry No. 16-4 at 3). Taylor determined that "[d]uring the May 24–26, 2015 storm, the elevator cab was located in the basement (first floor) at the time of the flood and sustained heavy damage. There is no damage, due to any cause, to the elevator components located above the first, flooded level of the residence from the May 24–26, 2015 storm." (Docket Entry No. 16-13 at 3). Ekhlassi's claim stated that it "is only an estimate on the damage incurred due to flooding." (Docket Entry No. 6-7 at 2).

The undisputed record evidence shows that, as a matter of law, the flood did *not* damage to the kitchen cabinets. The repair estimate included the cost of removing and replacing the cabinets in order to repair any damage to the floor, on the incorrect assumption that the wood floor extended beneath the cabinets. Taylor stated that during the July 2017 inspection, Ekhlassi told him that "there was no physical damage to the lower and full height cabinets, but the cabinets would need to be removed in order to perform the necessary work on the wood flooring." (Docket Entry No. 16-13 at 3). Taylor's own inspection and consultation with an engineering firm revealed that "the

8

wood flooring does not continue under the existing lower cabinets, but stops under the toe kick . . . . Since the wood flooring does not continue under the cabinets, it is unnecessary to remove and replace all lower and full height cabinets in order to replace the wood flooring." (Docket Entry No. 16-13 at 3). Taylor inspected Ekhlassi's home again in September 2017 and "observed that the wood flooring terminates at the kitchen cabinets and does not continue underneath the cabinets. These findings further confirm my opinion that it is unnecessary to remove and replace all lower and full height cabinets in order to replace the wood flooring." (Docket Entry No. 16-13 at 3). Lasater also stated that "the hardwood flooring in the residence does not extend below the base cabinets that would require their removal should floor surface replacement be undertaken." (Docket Entry No. 16-4 at 4). No evidence controverts the facts showing a need to remove and replace the kitchen cabinets.

Finally, there is no dispute that part of the floor damage predated the May 2015 flood. The prior damage resulted from improper design and installation. Lezell stated that some of the buckling in the floor, "mainly in portions of the living room and foyer where the stone was inserted and abutted to the cupped wood[,]" was the result of "improper installation of marble." (Docket Entry No. 16-14 at 5). Lezell explained that the repair estimate provided by a floor company included a similar note: "It is never recommended to instal marble slabs over wood framing, due to the movement of the wood and the rigidity of the marble slabs. However, we have no choice but to duplicate the original design in this situation. We plan to take every precaution possible to minimize the potential for hairline cracks in the stone, but fully expect some to appear over time . . . [the floor company] will not be held responsible for floor problems resulting from previously existing conditions such as a bonding failure due to the previous use of incompatible maintenance products,

9

or inadequate air conditioning, heating, humidity, or moisture control." (Docket Entry No. 16-14 at 5, quoting Docket Entry No. 16-8 at 3). Design or installation defects are not among the named perils covered by the Homeowners Policy. (Docket Entry No. 16-2 at 17–19).

Based on the undisputed record evidence that the floodwater, water vapor, or surface water caused the floor and elevator damage, and the undisputed record evidence that Ekhlassi's Homeowners Policy did not cover these losses, Auto Club had no contractual obligation to cover the claimed floor or elevator damage. Based on the undisputed record evidence that the wood flooring did not extend beneath the kitchen cabinets, Auto Club had no contractual obligation to cover the cost of the unnecessary cabinet removal and replacement. Based on the undisputed record evidence that the Ekhlassi's Homeowners Policy did not cover design or installation defects, Auto Club had no contractual obligation to cover the cost of repairs to the wood floor caused by those defects. Auto Club is entitled to judgment as a matter of law.

## IV. Conclusion

Based on the undisputed record evidence, Auto Club's briefing, and the applicable legal standards, Auto Club's motion for partial summary judgment is granted. Ekhlassi's claims against Auto Club are dismissed, with prejudice.

SIGNED on November 27, 2017, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge